# In the United States Court of Federal Claims

**No. 09-237C**
**(Filed: April 8, 2010)**

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * | * |
| | * |
| THE LEGAL AID SOCIETY OF | * |
| NEW YORK, | * |
| | * **Motion to Dismiss; RCFC 12(b)(1);** |
| Plaintiff, | * **RCFC 12(b)(6); Breach of Contract;** |
| | * **Meeting of the Minds; Intent to** |
| v. | * **Contract; Ancillary Equitable Relief.** |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |
| | * |
| * * * * * * * * * * * * * * * * * * * | * |

*Kevin Patrick Mullen,* Washington, DC, for plaintiff.   Christopher J. Kimball, Washington, DC, of counsel.

*Stacey K. Grigsby,* U.S. Department of Justice, Washington, DC, with whom were *Tony West,* Assistant Attorney General, and *Jeanne E. Davidson,* Director, for defendant.

# O P I N I O N

**FIRESTONE**, *Judge*.

Pending before the court is the motion of the defendant, the United States ("the government" or "the defendant"), to dismiss the complaint brought by the plaintiff, Legal Aid Society of New York ("LASNY" or "the plaintiff"), pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC") for failure to state a claim

upon which relief may be granted and RCFC 12(b)(1) for lack of subject matter jurisdiction.

This case arises from LASNY's grant from the Administrative Office of the United States ("AO") to provide public defender services in the Southern and Eastern Districts of New York.  These services were provided by LASNY's Federal Defenders Division ("FDD" or "the FDD").  In 2005, the AO decided to establish a separate corporation, which became known as the Federal Defenders of New York, Inc. ("the FDONY"), to carry out the duties that had been performed by LASNY under the grant.  As a result, LASNY's last grant with the AO for the FDD concluded on September 30, 2005 and the FDD dissolved at that time.

In its complaint, LASNY seeks relief totaling $1.7 million from the government.  LASNY claims that the AO owes it this amount to pay for a portion of the LASNY pension deficit that is allegedly attributable to LASNY's former FDD employees who remain part of LASNY's pension plan even though they are now employed by the FDONY.  Specifically, LASNY seeks to retain $351,167 in unspent grant funds and an additional $1,348,833 in money damages to cover the deficit.

For the reasons that follow, the court **GRANTS** the government's motion to dismiss for failure to state a claim under RCFC 12(b)(6).  In addition, because LASNY has not stated a claim for money damages against the government, the court finds that it does not have jurisdiction over LASNY's claim to retain the $351,167 in unspent grant funds,

which LASNY failed to return to the AO following the conclusion of the grant.  Therefore,

the government's motion to dismiss this claim for lack of jurisdiction under RCFC

12(b)(1) is also **GRANTED**.

**FACTS**

The following facts are taken from the complaint and from the documents relating

to the grant furnished by the parties.[1]  From sometime in 1972 to September 30, 2005,

LASNY maintained the FDD, which served as the Community Defender Organization

("CDO") for the Eastern and Southern Districts of New York.  This CDO was established

---

[1]The government relies on several documents not attached to the plaintiff's complaint to support its motion to dismiss.  As a general rule, "Courts 'generally consider only the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record' when deciding a motion to dismiss."  Am. Contractors Indem. Co. v. United States, 81 Fed. Cl. 682, 686 (2008) (quoting Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)) (internal brackets omitted), rev'd on other grounds, 570 F.3d 1373 (Fed. Cir. 2009).  Under RCFC 12(d), "if matters outside the pleadings are presented to and not excluded by the court" on a motion to dismiss for failure to state a claim, "this motion must be treated as one for summary judgment under RCFC 56."  RCFC 12(d).

The requirement for conversion of a motion to dismiss to a motion for summary judgment contained in RCFC 12(d) does not apply to motions to dismiss for lack of jurisdiction brought under RCFC 12(b)(1).  Indeed, on an RCFC 12(b)(1) motion, the court is permitted to "inquire into jurisdictional facts that are disputed."  Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991).

In the instant case, while the plaintiff, in its complaint, referenced the documents it relied on to support its contention that a contract existed with the government, it did not provide copies of these documents.  In support of its motion to dismiss, which was predicated on the government's belief that no such contract existed, the government provided all but one of these referenced documents, which the parties later provided.

Because the parties dispute the existence of a contract and the existence of such a contract was required for this court to exercise subject matter jurisdiction over part of the plaintiff's complaint, this court looked to those documents for the purpose of ruling on the motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1).  Having reached this conclusion, the court then relied on this holding in ruling on the defendant's motion to dismiss for failure to state a claim pursuant to RCFC 12(b)(6).

by LASNY and funded by the AO pursuant to the Criminal Justice Act ("CJA"), 18 U.S.C.

§ 3006A (2006).  As a CDO, the FDD provided legal representation to eligible persons

under 18 U.S.C. § 3006A(a)(1) (2006).[2]  For fiscal year 2005, which ran from October 1,

2004 through September 30, 2005, LASNY received $10,818,200 in funding from the AO

pursuant to a grant agreement.  See App. to Mot. Dismiss 1-13 ("the Grant Agreement" or

"the 2005 Grant Agreement").

The Grant Agreement contained the terms of the government's obligation under the

grant, including the following pertinent sections in order of their inclusion in the grant.

---

[2]The CJA provides for government-funded legal representation.  It creates two types of
defender organizations eligible for federal funding under the CJA: Federal Public Defender
Organizations and CDOs.  18 U.S.C. § 3006A(g) (2006).  The difference between the two types
of organizations has been described as follows:

> Federal Public Defender[ Organizations] are federal entities whose personnel are
> federal employees within the jurisdiction of the judicial branch.  The directors are
> appointed by the court of appeals of the circuit and are subject to removal by that
> court.    CDO[]s are non-profit legal service organizations established and
> administered by groups authorized by the [CJA] plan and approved by the judicial
> governing body of the circuit in a plan adopted for that circuit.  Unlike the Federal
> Public Defender [Organization], a CDO operates under a board of directors[] and is
> not directly governed by the local federal judiciary.  A CDO may be funded by grants
> from the Judicial Conference or through submission of vouchers on a case-by-case
> basis.  The terms and conditions of the [grant] are established by agreement between
> the attorney and the directors.  Employees of CDO[]s receive salaries and benefits as
> determined by the organization, although subject to the review and approval of the
> Defender Services Division under the Judicial Conference.

Inga L. Parsons, "Making It a Federal Case": A Model for Indigent Representation, 1997 Ann.
Surv. Am. L. 837, 844-45.  See also 18 U.S.C. § 3006A(g).  The Judicial Conference delegates
responsibility for administration of these grants to the AO.  See The Defender Services Program,
http://www.uscourts.gov/defenderservices/history.html (last visited Apr. 1, 2010) ("Program
support for the CJA is provided by the Office of Defender Services of the [AO].").

First, Section[3] 4 of the Grant Agreement ("Section 4") reads as follows:

**4. REALLOCATING FUNDS:** Subject to such limitations as the Defender Services Committee may establish, the grantee [(LASNY)] may reallocate grant funds between budget categories (i.e., for purposes not specifically identified within the funding justification), provided that the aggregate of the amounts transferred within the fiscal year does not exceed 15% of the organization's total fiscal year grant amount approved by the Defender Services Committee. Subject to such limitations as the Defender Services Committee may establish, the [AO] may authorize reallocation between budget categories in any amount.[4]

Section 10 of the Grant Agreement ("Section 10") states:

**10. GRANTEE STATUS:** Neither the grantee nor any of its employees are officers, employees, or agents of the United States. The United States shall in

---

[3]While, in some places, the Grant Agreement refers to its provisions as "clauses," the court will use the parties' term, "sections," for ease of reference.

[4]In addition to the Grant Agreement, LASNY's rights and obligations were further defined by a document entitled "[CDO] Supplement to Fiscal Year 2005 Grant and Conditions (Changes, Clarifications, and Additional Information)" ("the Grant Supplement"). App. to Mot. Dismiss 1-13. The Grant Supplement contained the following, pertinent language:

    **II.**    **Other Policies Applicable to CDOs (but not in the Grant Agreement)**
    **A.**    **Judicial Conference Policies that Vary from the Grant Provisions**
        The introductory language of the [Grant Agreement] states that CDOs, by signing the [G]rant [A]greement, agree to comply with the terms and conditions of the grant, the provisions in the [CJA], the Guidelines for the Administration of the Criminal Justice Act, and the court plans of the applicable district(s) and circuit, and also with **"any other policies or directives issued by the Judicial Conference . . .[ .]"** The following Judicial Conference policies are in addition to, or supercede the written grant provisions:
        &bull; **Spending Restrictions**
    . . . When a CDO's planned benefits program exceeds national average [Federal Public Defender Office] costs (in terms of the organizations benefits-to-salary ratio) by more than 3 percent, it must submit a written justification to the Defender Services Committee's Budget Subcommittee.

Id. at 9 (quoting id. at 1 (the Grant Agreement)) (internal brackets removed). This proviso put further limitations upon LASNY's ability to reallocate grant funds for pension and other benefits.

no way be obligated under leases, contracts, or other agreements entered into by the grantee.

Section 12 of the Grant Agreement ("Section 12") provides, in pertinent part:

**12.   DISSOLUTION OF GRANTEE ORGANIZATION OR TERMINATION OF GRANT FUNDS:** The grantee may dissolve on its own accord in accordance with the laws of the state in which it is organized. . . . Additionally, the [Judicial] Conference in its discretion may determine to terminate or not renew the grant.  In either event, unless otherwise authorized by the [AO], the grantee shall properly inventory and make available for reclamation, all property in the care and custody of the grantee purchased with grant funds or related income.  Within 75 days of dissolution, the Auditor[5] will perform a final financial audit of the grant. . . . Upon receipt of the report of this audit, grantee shall remit to the [AO]'s Accounting Division all remaining unobligated or unexpended grant funds, grant interest, and grant-related income.  The United States shall not be responsible for any obligations or debts incurred by the grantee and the grantee shall hold the United States harmless for such obligations or debts.

LASNY provided a pension plan ("LASNY Pension Plan") for all of its employees, including the FDD employees covered by the AO grant.  During fiscal year 2005, LASNY used funds from the AO grant to pay salaries and other costs, including pension costs for employees in the FDD.  LASNY used funds from its grant for these purposes with the permission and knowledge of the AO.

During fiscal year 2005, LASNY and the AO worked together on a plan that resulted in the creation of an independent CDO, which would be separate from LASNY. In connection with the planned dissolution of the FDD, the AO sent a letter to Peter v. Z. Cobb ("Mr. Cobb"), president of LASNY, dated August 31, 2005, in which it requested

---

[5]Section 8 of the Grant Agreement explains that "the Auditor" refers to "a contract auditor . . . selected and paid for by the [AO] . . . ."

that LASNY make certain payments in order to help create the FDONY.  The letter stated,

in pertinent part:

> This is to authorize and request that [LASNY] make certain payments on behalf
> of the [FDD], which are necessary for its conversion into an independent
> [CDO] that will serve the Eastern and Southern Districts of New York,
> beginning October 1, 2005.  The Office of Defender Services has determined
> that these payments are proper under the current grant and conditions
> agreement, and the Office of Audit, which will oversee the audit of the fiscal
> year 2005 grant provided by the [AO] to [LASNY] for the purposes of funding
> the [FDD], concurs with this arrangement.  A list of the payments is attached.
>
> Please be assured that the [AO] is prepared to supplement the fiscal year 2005
> grant to [LASNY] if these expenses, or any other legitimate expenses attributed
> to the [FDD], would cause the current grant to be exceeded.

Letter from Theodore Lidz, Assistant Director, AO, to Peter v. Z. Cobb, President,

LASNY (Aug. 31, 2005) at App. to Mot. Dismiss 14-15, 14 ("August 2005 letter").  The

referenced list, attached to that letter and entitled "Financial needs to ensure the [FDONY]

is operational on October 1, 2005," id. at 15, reads, in full, as follows:

> Money to Establish Benefits (All one month's premium unless specified).
> | | |
> |---|---|
> | $60,000 | Oxford Medical |
> | $3,600 | Horizon Dental |
> | $600 | Spectera Vision |
> | $1,900 | Met Life Group Life/ A D & D |
> | $1,000 | Guardian Long Term Disability |
> | $300 | Fid Ins of America NY State Mandated Short Term Dis |
> | $1,700 | Guardian [S]upplemental Short Term Disability |
> | $950 | Employee Assistance Program (Yearly) |
> | $1,000 | C[OBRA] Admin (Yearly) |
> | $2,000 | [New York State] Unemployment Insurance (Estimate) |
> | $73,050 | |

In addition, the following are required:

| $10,000 | JP Morgan Chase Bank to open Accounts |
| $10,000 | Citibank NA to open Account |
| $5,000 | Transit Checks Up Front Payment |
| $5,000 | Regular Insurance including Prof Liability.  No quotes yet, but an estimate. |
| $6,250 | Vanguard.  Set up fees for defined contribution pension fund. |
| <u>$10,000</u> | Misc including possible payment to accounting firm to review controls |
| $46,250 | |

Grand Total $119,300

<u>Id.</u>

On the last day of fiscal year 2005 (September 30, 2005), the FDD formally dissolved.  The next day, the first day of fiscal year 2006, the FDONY began operations as a new corporation, one that was not affiliated with LASNY.  Substantially all of the FDD's employees became FDONY employees when the conversion occurred ("the transferred employees").  Some of the transferred employees retained their interests in the LASNY Pension Plan.  The former FDD employees that did not go to the FDONY all retained their interests in the LASNY Pension Plan.

Prior to dissolution of the FDD, LASNY learned that the LASNY Pension Plan was under-funded (i.e., the plan's liabilities exceeded the market value of its assets).  Specifically, the LASNY Pension Plan had pension benefit obligations with a present value of approximately $87 million but assets with which to fund these obligations totaling only $56 million.  This resulted in a $31 million pension deficit.  In an audit performed after fiscal year 2005 had ended, the actuary for the LASNY Pension Plan, Buck

Consultants, determined that the portion of the LASNY Pension Plan attributable to the transferred employees was $1.7 million.[6]  LASNY does not allege that it shared this information with the AO.

After FDONY was established, LASNY proposed to the AO that LASNY be allowed to spin off the portion of its pension plan attributable to the transferred FDD employees and transfer that spun-off plan to the FDONY ("the spin-off").  Under the proposal, the spin-off would have been under-funded at the same percentage as the FDD portion of the LASNY Pension Plan from which it was spun-off.  This arrangement would have effectively relieved LASNY of any responsibility for the transferred employees' pensions and would have transferred responsibility for the FDD share of LASNY's pension deficit to the FDONY.

LASNY and the AO discussed the proposed spin-off between October 2005 and February 2006.  LASNY does not allege to have proposed or discussed the idea for a pension plan spin-off until after the FDD dissolved.  The AO ultimately rejected the proposed spin-off.  In a February 16, 2006 letter from the AO to LASNY, the AO explained that the government was not liable for any portion of LASNY's pension deficit and that LASNY could not retain grant funds to cover the alleged deficit.  The letter stated:

---

[6]Specifically, the plaintiff claims that the portion of the LASNY Pension Plan attributable to the transferred employees consisted of $2.8 million in assets and $4.5 million in liabilities, a difference of $1.7 million.  Compl. ¶ 28.

The Criminal Justice Act and the Grant and Conditions document provide the
authority for the funding which [LASNY] has received from the judiciary.  The
Grant and Conditions document ([Sections] 10 and 12) specifically exempts the
federal government from liability for "contracts[] or other agreements entered
into" or "obligations or debts incurred" by the grantee.  Grants provide a
maximum funding level for personnel benefits, but grantee organizations have
had discretion to determine what benefits to provide to their staff and how
much or how little their employees should contribute to their costs.  The
judiciary did not create the pension plan, offered no promise to fund it, is not
a party to it, and has not been consulted concerning changes to its provisions or
funding.  Neither we nor our Office of General Counsel can find either a legal
or equitable basis for funding the relief you now seek.  Accordingly, [LASNY]
may not treat the claimed underfunding as an expense to be charged against
grant funds.

Letter from Theodore J. Lidz, Assistant Director, AO, to Peter v. Z. Cobb, President,

LASNY (Feb. 13, 2006) ("February 2006 letter") (quoting Sections 10, 12).

On September 30, 2005, the last day of the grant term, $622,144 of grant funds

remained unspent.  Subsequent expenditures reduced this balance to $351,167.  In a letter

dated May 21, 2007, the AO notified LASNY that LASNY "owes a debt to the United

States Government in the amount of $351,167."  Compl. ¶ 31.  Having failed to reach an

agreement with the AO with regard to the FDD pension issue, on March 10, 2008,

LASNY submitted a claim to the AO for supplemental grant funds to cover the $1.7

million pension deficit and requested that the AO refrain from collection efforts with

respect to the $351,167 in remaining grant funds.

In response to LASNY's March 10, 2008 claim, the AO issued a letter dated

May 15, 2008 denying LASNY's claim as "unpersuasive."  Id. ¶ 32.  In a letter dated

August 15, 2008, the AO demanded $351,167 from LASNY within thirty days and stated

its intention to refer LASNY's alleged debt to the Treasury for collection.  On April 20,

2009, LASNY filed its complaint in this court, seeking a judgment that the AO is not

entitled to recover any grant funds from LASNY in connection with the 2005 Grant

Agreement and a permanent injunction against the AO

> from making any efforts to collect from LASNY any of the $351,167 in unspent
> Grant funds, directly or through referral, and from taking any other action likely
> or intended to impair LASNY's eligibility or qualifications for federal grant
> funding, and from assessing LASNY with any administrative costs, fees,
> penalties, or interest related to the collection of the $351,167 in unspent Grant
> funds[.]

Id. at 12.  LASNY also sought $1,348,883 from the AO to cover the remainder of the

pension deficit.

At the initial status conference with the parties on April 20, 2009, the government

informed the court that the AO had agreed not to refer the $351,167 debt to the Treasury

for an additional thirty days in order to give the court time to consider the government's

motion to dismiss the plaintiff's request for preliminary injunctive relief for lack of subject

matter jurisdiction.  In an order dated May 15, 2009, this court found that it did not have

jurisdiction over the plaintiff's claim for preliminary injunctive relief because the

equitable relief sought was not "tied and subordinate to a money judgment."  Order

Granting Def.'s Mot. Dismiss Pl.'s Req. for Prelim. Inj. 6, May 15, 2009 (quoting James v.

Caldera, 159 F.3d 573, 580 (Fed. Cir. 1998)).

The government then filed the pending motion to dismiss LASNY's complaint for

lack of jurisdiction and failure to state a claim.  Briefing on the government's motion to

dismiss is complete.  Oral argument was held on March 31, 2010.

## STANDARD OF REVIEW

The standard for ruling on a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) is well-settled.  The plaintiff bears the burden of establishing subject matter jurisdiction, Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing McNutt v. Gen. Motors, 298 U.S. 178, 189 (1936)), and must do so by a preponderance of the evidence, Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).  Because jurisdiction is a threshold matter, a case can proceed no further if a court lacks jurisdiction to hear it.  See Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006) ("[W]hen a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety." (citation omitted)); Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998).  See generally John R. Sand & Gravel v. United States, 552 U.S. 130 (2008).  It is well-settled that when the court considers a motion to dismiss for lack of subject matter jurisdiction, it may look beyond the pleadings and "inquire into jurisdictional facts" to determine whether jurisdiction exists.  Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991).

The standard for a motion to dismiss for failure to state a claim pursuant to RCFC 12(b)(6) was recently discussed by the Federal Circuit in Totes-Isotoner Corp. v. United States, 594 F.3d 1346 (Fed. Cir. 2010), following the Supreme Court's decisions in Ashcroft v. Iqbal, --- U.S. ----, 129 S. Ct. 1937 (2009), and Bell Atl. Corp. v. Twombly,

550 U.S. 544 (2007).  In <u>Totes-Isotoner</u>, the Circuit stated:

> While a complaint . . . does not need detailed factual allegations, a plaintiff's
> obligation to provide the grounds of his entitle[ment] to relief requires more
> than labels and conclusions, and a formulaic recitation of the elements of a
> cause of action will not do.  Factual allegations must be enough to raise a right
> to relief above the speculative level. . . . [S]uch a claim requires a complaint
> with enough factual matter (taken as true) to suggest that [a claim is plausible].

<u>Totes-Isotoner</u>, 594 F.3d at 1354 (quoting <u>Twombly</u>, 550 U.S. at 555-56 (internal

quotation marks and further citation omitted)) (brackets in original).  In this connection,

the court will be called upon to "draw on its judicial experience and common sense."

<u>Iqbal</u>, --- U.S. at ----, 129 S. Ct. at 1950.

## DISCUSSION

I.     **LASNY Has Failed to State A Claim That the AO Agreed to Assume LASNY's
       Pension Obligations for Former FDD Employees.**

LASNY alleges in its complaint that the government is obligated to pay LASNY for

the FDD share of LASNY's pension deficit under two theories.  First, LASNY alleges that

the August 2005 letter to LASNY from the AO regarding the creation of the FDONY

reflects the parties' mutual understanding of the AO's obligation under the Grant

Agreement to fund the dissolution of the FDD and absorb all costs associated with the

creation of the FDONY.  LASNY alleges that this includes paying LASNY the portion of

the LASNY pension deficit attributable to the FDD employees.  According to LASNY, the

August 2005 letter demonstrates that the AO understood that under the Grant Agreement,

the AO would pay "all legitimate costs" associated with the dissolution of the FDD.

LASNY asserts that the FDD share of LASNY's pension deficit is such a cost.

Second, LASNY argues that the August 2005 letter and alleged but unspecified verbal promises[7] made by the AO in connection with the dissolution of FDD created a separate contract in which the AO agreed to supplement LASNY's grant to fund the portion of LASNY's pension deficit attributable to former FDD employees. Because the AO refused to fulfill its obligations under either the Grant Agreement or the August 2005 letter agreement, LASNY seeks $1.7 million in damages for breach.

The government's motion to dismiss asserts that LASNY has failed to state a claim on the grounds that neither the Grant Agreement nor the August 2005 letter establish that the AO was obligated or committed to pay any portion of LASNY's pension deficit. For the reasons discussed below, the court agrees with the government.[8]

---

[7]See Compl. ¶ 14 ("In discussions preceding the dissolution of FDD, [the AO] represented to LASNY that the resulting split of FDD from LASNY would not have adverse financial consequences for LASNY.").

[8]The relief sought by LASNY is, in other contexts, referred to as a "segment-closing adjustment," a concept at the core of several cases to come before this court in the past fifteen years. See generally Teledyne, Inc. v. United States, 50 Fed. Cl. 155 (2001) ("Teledyne") aff'd sub nom. Allegheny Teledyne Inc. v. United States, 316 F.3d 1366 (Fed. Cir. 2003), cert. denied, Gen. Motors Corp. v. United States, 540 U.S. 1068 (2003). The basic concept of a segment-closing adjustment is that in situations where a company's business segment performing government contracts that provided reimbursement for actual pension costs is terminated, sold, or otherwise disposed of ("closed"), there is a settling-up of pension costs when that segment is closed. Under Cost Accounting Standard ("CAS") 413.50(c)(12), 48 C.F.R. § 9904.413-50(c)(12) (2006) ("CAS 413"),

> If a segment is closed, if there is a pension plan termination, or if there is a curtailment of benefits, the contractor shall determine the difference between the actuarial accrued liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated. The

A.    The Grant Agreement Unambiguously Provides That the Government Is Not
      Obligated to Pay LASNY's Pension Deficit Attributable to FDD Employees.

The government argues that the complaint must be dismissed because the Grant

Agreement plainly immunizes the government from any liability for LASNY's pension

obligations.  It asserts that in Section 10, the government expressly refused to assume any

liability for the LASNY Pension Plan and that Section 12 requires that LASNY hold the

government harmless for any of LASNY's debts or obligations.  Therefore, the

government argues, the Grant Agreement is unambiguous and there is no reason to use

extrinsic evidence to determine the intent of the parties; the government is not liable for

LASNY's pension deficit.

In response, LASNY argues that the Grant Agreement provides for the use of grant

funds to cover LASNY's pension deficit.  LASNY urges the court to look to the August

2005 letter as evidence of the parties' mutual understanding of the Grant Agreement as

obligating the government to pay all of LASNY's costs attributable to the dissolution of

the FDD, which, LASNY argues, include the FDD share of the LASNY pension deficit.

See Pl.'s Resp. 9-10 ("The [August 2005 letter . . . reflects the parties' mutual

understanding of [the AO's] obligation under the Grant [Agreement] to fund the

difference between the market value of the assets and the actuarial accrued liability
for the segment represents an adjustment of previously-determined pension costs.

Thus, where CAS 413 applies, the contractor is reimbursed for a pension deficit or the
government is refunded any pension surplus.  However, because CAS 413 does not apply to CJA
grants, no such adjustment is available to the parties in this case.

-15-

dissolution of [the] FDD and its conversion to a CDO, as directed by [the AO].").

The court agrees with the government that the terms of the Grant Agreement unambiguously immunize the AO from any liability for the alleged pension deficit and therefore the court has no basis for using the August 2005 letter to aid in understanding the Grant Agreement.

The Federal Circuit has detailed the situations in which extrinsic evidence may be used to aid the court in understanding a contract. In TEG-Paradigm Envtl., Inc. v. United States, 465 F.3d 1329, 1338 (Fed. Cir. 2006), the Circuit stated:

> When interpreting a contract, "'the language of [the] contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances.'" Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin., 169 F.3d 747, 752 (Fed. Cir. 1999) (quoting Hol-Gar Mfg. Corp. v. United States, . . . 351 F.2d 972, 975 (Ct. Cl. 1965)). When deriving this meaning, we begin with the contract's language. Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc). When the contract's language is unambiguous it must be given its "plain and ordinary" meaning and the court may not look to extrinsic evidence to interpret its provisions. Id. at 1040; McAbee Constr.[, Inc. v. United States], 97 F.3d [1431,] 1435[ (Fed. Cir. 1996)]. Although extrinsic evidence may not be used to interpret an unambiguous contract provision, we have looked to it to confirm that the parties intended for the term to have its plain and ordinary meaning. . . . When a provision in a contract is susceptible to more than one reasonable interpretation, it is ambiguous, Edward R. Marden Corp. v. United States, 803 F.2d 701, 705 (Fed. Cir. 1986), and we may then resort to extrinsic evidence to resolve the ambiguity, see McAbee, 97 F.3d at 1435. We utilize extrinsic evidence to derive a construction that effectuates the parties' intent at the time they executed the contract. See Dureiko v. United States, 209 F.3d 1345, 1356 (Fed. Cir. 2000).

Thus, under the Federal Circuit's rules as explained in TEG-Paradigm Envtl., this court may only look to extrinsic evidence where a contract is susceptible to more than one

reasonable interpretation and such extrinsic evidence will resolve that ambiguity or where extrinsic evidence is used to confirm that an unambiguous term is to be given its plain meaning.

Here, neither of the conditions for examining extrinsic evidence apply. First, contrary to LASNY's allegations, the grant in this case expressly states, without any exceptions, that the United States will not be responsible for any of LASNY's obligations or debts. As noted above, Section 12 provides, in pertinent part:

> **12.    DISSOLUTION OF GRANTEE ORGANIZATION OR TERMINATION OF GRANT FUNDS:** The grantee may dissolve on its own accord in accordance with the laws of the state in which it is organized. . . . Additionally, the [Judicial] Conference in its discretion may determine to terminate or not renew the grant. In either event, unless otherwise authorized by the [AO], the grantee shall properly inventory and make available for reclamation, all property in the care and custody of the grantee purchased with grant funds or related income. Within 75 days of dissolution, the Auditor will perform a final financial audit of the grant. . . . Upon receipt of the report of this audit, grantee shall remit to the [AO]'s Accounting Division all remaining unobligated or unexpended grant funds, grant interest, and grant-related income. <u>The United States shall not be responsible for any obligations or debts incurred by the grantee and the grantee shall hold the United States harmless for such obligations or debts</u>.

Section 12 (second emphasis added). The plain language of Section 12 unambiguously establishes that the United States will not be responsible for obligations of the grantee and that the grantee must hold the United States harmless for such obligations. This provision does not contain any limitations or exceptions. Thus, LASNY cannot look to the government for payment of any deficit in the LASNY Pension Plan.

Apparently recognizing that Section 12 is fatal to its grant claim, LASNY argues

that Section 12 does not apply to this dispute.  It contends that Section 12 applies only

where the grantee decides to terminate or not seek renewal of the grant on its own accord,

but not where the AO makes the decision to terminate the relationship with the grantee.[9]

LASNY supports its proffered interpretation of Section 12 with the following

abridged and misleading version of the section, a version which excludes language that is

adverse to the plaintiff's claims:

> **12.    DISSOLUTION    OF    GRANTEE    ORGANIZATION    OR
> TERMINATION OF GRANT FUNDS:** The grantee may dissolve on its own
> accord in accordance with the laws of the state in which it is organized. . . . The
> United States shall not be responsible for any obligations or debts incurred by
> the grantee and grantee shall hold the United States harmless for such
> obligations or debts.

Pl.'s Resp. 9 (quoting Section 12) (ellipsis in original).  This truncated version, however,

omits the critical language underlined in this full version of Section 12:

> **12.    DISSOLUTION    OF    GRANTEE    ORGANIZATION    OR
> TERMINATION OF GRANT FUNDS:** The grantee may dissolve on its own

---

[9]Specifically, LASNY argues:

In this case, FDD did not "dissolve on its own accord."  To the contrary, [the AO]
directed its dissolution and instructed LASNY to convert it to a new CDO, FDONY.
By following [the AO]'s direction, Plaintiff presently incurred pension liability for
the former FDD employees transferred to FDONY without corresponding Grant
funds.  Defendant's actions exceeded the circumstances prescribed in [S]ection 12
of the Grant [Agreement] under which [the AO] might be entitled to avoid the
reimbursement of the pension obligations incurred by LASNY, the grantee.
Defendant cannot escape its commitment to fund LASNY's pension obligation
incurred at [the AO]'s behest by hiding behind [S]ection 12 of the Grant
[Agreement].

Pl.'s Resp. 9 (quoting Section 12) (emphasis added).

accord in accordance with the laws of the state in which it is organized. Grantee shall provide the A.O., chief judge of the district court, and chief judge of the court of appeals 90 days' advance notice of its intent to dissolve. <u>Additionally, the [Judicial] Conference in its discretion may determine to terminate or not renew the grant.</u>  In either event, unless otherwise authorized by the [AO], the grantee shall properly inventory and make available for reclamation, all property in the care and custody of the grantee purchased with grant funds or related income.  Within 75 days of dissolution, the Auditor will perform a final financial audit of the grant.  The audit will be of the same scope as discussed in [Section] 8.  <u>Upon receipt of the report of this audit, grantee shall remit to the [AO]'s Accounting Division all remaining unobligated or unexpended grant funds, grant interest, and grant-related income.  The United States shall not be responsible for any obligations or debts incurred by the grantee and the grantee shall hold the United States harmless for such obligations or debts.</u>

Section 12 (emphasis added).  When this missing language is restored, it becomes obvious that Section 12 applies whenever there has been a decision to terminate or to not renew the grant regardless of whether that decision originated with the grantee or the AO.  The second sentence of Section 12 states in plain and unambiguous terms that it also applies where the AO decides to terminate the grant or not renew it.  There can be no question, therefore, that Section 12 applies to this case.

In addition to Section 12, Section 10 confirms that the AO never had any obligation to pay the pensions of FDD employees.  Section 10 plainly states, in pertinent part, that "[t]he United States shall in no way be obligated under leases, contracts, or other agreements entered into by the grantee."  Section 10 (emphasis added).  This unambiguous provision of the Grant Agreement makes it clear that the AO expressly disclaimed all responsibility for LASNY's agreement to pay pensions.

Because the language of Sections 10 and 12 is unambiguous, the court has no

occasion to consider the August 2005 to resolve the meaning of the Grant Agreement.  The

plaintiff's contention that the August 2005 letter confirms the AO's commitment in the

Grant Agreement to fund the FDD pension deficit must be rejected.  LASNY has not

identified any statement in the Grant Agreement whereby the government agreed to

assume LASNY's pension obligation and to pay any pension deficit.  To the contrary, the

Grant Agreement states unambiguously that the AO will not be liable.  See Sections 10,

12.  The plaintiff's attempt to use the August 2005 letter to demonstrate that the parties

intended otherwise must be rejected.  The Grant Agreement, by its unambiguous terms,

does not support a claim for payment of the deficit.  Therefore, the plaintiff's claim based

on the Grant Agreement must be dismissed for failure to state a claim.

> B.    Even If the Court Looks to the August 2005 Letter to Interpret the Grant
> Agreement, the Letter Does Not Demonstrate that the Parties Understood the
> Grant Agreement to Require Payment of the FDD's Share of LASNY's
> Pension Deficit.

Alternatively, the court finds that even if it were to consider the August 2005 letter

to determine the intent of the parties with regard to the Grant Agreement, the letter does

not demonstrate that in entering into this agreement, the AO understood the agreement to

obligate it to pay the pension deficit.  Therefore, the plaintiff's claim based on the Grant

Agreement would still fail, even if consideration of this extrinsic evidence were proper.

LASNY argues that the August 2005 letter confirms that the AO, in entering into

the Grant Agreement, agreed to reimburse LASNY for all of the costs associated with the

conversion of the FDD into the FDONY, including the costs associated with LASNY's

pension deficit.[10]  In its brief, LASNY asserts:

> The August 31, 2005 letter from [the AO] to LASNY reflects the parties'
> mutual understanding of [the AO]'s obligation under the Grant to fund the
> dissolution of FDD and its conversion to a[n independent] CDO, as directed by
> [the AO].  Specifically, in the letter, [the AO] states that LASNY's expenses
> "necessary for [FDD's] conversion" are "proper under the current grant and
> conditions agreement."  Similarly, the letter's attachment[11] describes these
> expenses as "[f]inancial needs to ensure the [FDONY] is operational on
> October 1, 2005."  Such "financial needs" included "[s]et up fees for defined
> contribution pension fund."
>
> In the letter, [the AO] committed to "supplement the fiscal year 2005 grant to
> [LASNY] if these expenses, or any other legitimate expenses attributed to the
> [FDD] would cause the current grant amount to be exceeded."

Pl.'s Resp. 9-10 (citations omitted).  The government argues that nothing in the letter

suggests that the parties thought that the Grant Agreement obligated the AO to fund the

FDD share of the pension deficit.  To the contrary, the government argues, the AO agreed

only to pay specific costs associated with creating the new entity and it never agreed to

take on the FDD pension.

    The court agrees with the government.  The court does not accept the plaintiff's

_____

[10]In this connection, the court notes that the plaintiff has admitted that the pension deficit
did not result from the conversion.  See Pl.'s Resp. 13 ("While it may be true that the
Government's breach of contract did not create the pension liability at issue, it did cause LASNY
to incur this liability without the promised reimbursement in Grant funds." (emphasis added)).  In
other words, the plaintiff argues that while the government's decisions not to supplement the
grant funds, not to allow the plaintiff to use excess grant funds towards the pension deficit, and to
deny the spin-off foreclosed the plaintiff from obtaining reimbursement for the pension deficit
from the AO, the plaintiff concedes that these actions did not cause the deficit.  Thus, the
government is correct in stating that the plaintiff has not established a link between the alleged
breach and the plaintiff's claimed damages.  See Def.'s Reply 9.

[11]As stated above, the attachment included a list of payments that the AO requested
LASNY to make.

claim that the August 2005 letter shows that the AO, when entering into the Grant

Agreement, agreed to ensure that the FDD share of LASNY's pension plan would be fully-

funded.  Contrary to LASNY's contention, the August 2005 letter does not state that

"LASNY's expenses 'necessary for [FDD's] conversion' are 'proper under the current

grant and conditions agreement.'"  Id. (quoting Mot. Dismiss 14 (the August 2005 letter)).

Rather, the letter states, in pertinent part,

> This is to authorize and request that [LASNY] make certain payments on behalf
> of the [FDD], which are necessary for its conversion into an independent
> [CDO] . . . .  The Office of Defender Services has determined that these
> payments are proper under the current grant and conditions agreement . . . . A
> list of the payments is attached.

Mot. Dismiss 14 (the August 2005 letter) (emphasis added).  Viewed in context, it is clear

that the AO only states in this letter that the AO wants LASNY to make "certain payments,

which are necessary for FDD's conversion into an independent CDO," and that the AO has

determined that it is these costs that are "proper under the current grant and conditions

agreement."  Id.  Although it is true that the letter states, "[T]he [AO] is prepared to

supplement the fiscal year 2005 grant . . . if these expenses, or any other legitimate

expenses attributed to the [FDD], would cause the current grant amount to be exceeded,"

id. (emphasis added), this portion of the letter must be read in the context of the preceding

sentences, which reference the Grant Agreement.  This statement cannot plausibly be

construed to mean that the AO also agreed to supplement the grant with over $1 million in

extra funds to pay a pension deficit for which the AO, by the express terms of the Grant

Agreement, was not liable.  See Arizona v. United States, 575 F.2d 855, 863 (Ct. Cl. 1978)

("[P]rovisions of a contract must be so construed as to effectuate its spirit and purpose, . . .

considered as a whole and interpreted so as to harmonize and give meaning to all of its

provisions[.] . . . [A]n interpretation which gives a reasonable meaning to all parts will be

preferred to one which leaves a portion of it useless, inexplicable, inoperative, void,

insignificant, meaningless, superfluous, or achieves a weird and whimsical result.").  As

discussed above, under Sections 10 and 12, the government did not owe LASNY any

money for the pension deficit, an obligation bourne by LASNY, not the AO.  Thus, an

agreement to pay the deficit would be inconsistent with the Grant Agreement.

 The LASNY pension deficit existed independently from the conversion and was not

caused by it.[12]  Indeed, it is not disputed that the deficit existed while the FDD was still in

existence.  In this connection, it is important to note that LASNY's entire pension plan

suffers from a deficit, not simply the FDD portion.  These facts highlight the contrast

between the pension deficit and the other costs identified in the August 2005 letter.  The

---

  [12]In its brief and at the oral argument, counsel for LASNY stated that the creation of the
FDONY may have encouraged certain FDD employees to start collecting a pension and that this
contributed to the pension deficit.  See Pl.'s Resp. 8 ("The obligation to fund [the deficit] arose
unexpectedly as a direct consequence of [the AO's] mandate that LASNY dissolve FDD and pay
out the pension benefits to the former FDD employees who were transferred to FDONY."); Tr.
33:9-13 ("[T]he problem that results by virtue of tranferring the operations to [FDONY] at the
direction of the government is you have a pension plan that now has to pay out claims, and
making it further underfunded.").  LASNY did not allege any facts in its complaint to support
this contention.  Moreover, it is not relevant.  In this litigation LASNY seeks payment for the
pension deficit in its pension plan that is attributable to the transferred employees.  LASNY does
not seek any specific damages associated with the decision of some former FDD employees to
start taking a pension.

letter identifies the new costs that arose from the creation of the FDONY.  As shown above, the pension deficit costs do not fall within that category.

In view of the foregoing, the court agrees with the government that LASNY has failed to state a claim for payment of the pension deficit under the terms of the Grant Agreement even if the court looks to the language of the August 2005 letter.  For the reasons explained above, the court may not look to that letter to interpret the Grant Agreement.  In the alternative, even if it were proper to consider the letter as extrinsic evidence, nothing in that letter demonstrates that the parties understood the Grant Agreement to obligate the AO to pay these costs.  Therefore, the plaintiff's claim that the August 2005 letter demonstrates that the Grant Agreement obligated the AO to pay for the FDD's share of LASNY's pension deficit must be dismissed for failure to state a claim pursuant to RCFC 12(b)(6).[13]

---

[13]The plaintiff also argues that the fact that the AO permitted LASNY to use grant funds to pay for pension liabilities during previous CJA grant years indicates that the AO viewed the Grant Agreement as obligating it to pay for pension costs.  See, e.g., Compl. ¶ 45 ("Based on years of operating as an [AO]-funded CDO, LASNY properly regarded the LASNY Pension Plan as a component of FDD's personnel compensation costs in FDD's budget.  The fact that [the AO] shared LASNY's understanding in this regard is evident from the parties' prior practice of adjusting the Grant's administrative overhead rate in response to fluctuations in [the] LASNY Pension Plan's funding obligations each year."); Tr. 24:18:22 (noting that the parties do not dispute that "during the course of the performance of the grant itself, and prior grants, . . . the pension costs were treated as legitimate expenses and a category for recovery.").

The plaintiff is correct that it is not in dispute that the AO permitted grant funds to be used for pension costs.  However, the plaintiff has not alleged that the AO ever supplemented grant funds to pay for LASNY's pension obligations.  Therefore, to the extent that LASNY is suggesting that the parties' treatment of pension costs over the 2005 grant year and previous grant years indicates that the AO intended, under the 2005 Grant Agreement, to fully fund the FDD share of LASNY's pension plan, such an argument does not support LASNY's claim.

C.     The Plaintiff Has Failed to State a Claim Based on the August 2005 Letter
       As a Separate Agreement in Which the AO Promised to Reimburse LASNY
       for the Portion of the LASNY Pension Deficit Attributable to the FDD.

The court now turns to the government's motion to dismiss LASNY's alternative

claim for payment of the pension deficit.  This claim rests on the plaintiff's theory that the

August 2005 letter constitutes a separate and independent agreement by the AO to

reimburse LASNY for the pension deficit attributable to the transferred employees.[14]  The

government moves to dismiss this claim on the grounds that LASNY has failed to

establish that the August 2005 letter created a contract to pay the deficit.  For the reasons

explained below, the plaintiff cannot demonstrate LASNY's intent to be contractually

bound to pay this deficit by the August 2005 letter.

It is well-settled that a party alleging a contract with the government must allege

_____

        [14]LASNY also claims the existence of "oral representations that LASNY would suffer no
adverse consequences in connection with the dissolution," Compl. ¶ 16, and claims that the AO's
"written and verbal statements evidence an intent to form a binding agreement, based on mutual
consideration, to reimburse LASNY's costs incurred in the dissolution and conversion of FDD to
a CDO," Pl.'s Resp. 10 (emphasis added).  LASNY, however, gives no information regarding
such promises other than a few vague allusions to their existence.
        As stated above, "Factual allegations must be enough to raise a right to relief above the
speculative level. . . . [S]uch a claim requires a complaint with enough factual matter (taken as
true) to suggest that [a claim is plausible]."  Totes-Isotoner, 594 F.3d at 1354-55 (quoting
Twombly, 550 U.S. at 555-56 (further citation omitted) (brackets in original); see also Iqbal, ---
U.S. at ----, 129 S. Ct. at 1949 ("To survive a motion to dismiss, a complaint must contain
sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"
(quoting Twombly, 550 U.S. at 570)).  Putting aside the issue of whether the August 2005 letter
would supercede any such oral promises, the plaintiff's vague references to some statements an
unidentified person at the AO may have made at some point does not move the plaintiff's claim
across the line from conceivable to plausible.  Thus, the plaintiff cannot be said to have pled
sufficient facts to show that such statements included a promise to reimburse LASNY for any
part of its pension deficit.

sufficient facts to show a mutual intent to contract.  In <u>Bank of Guam v. United States</u>, 578 F.3d 1318 (Fed. Cir. 2009), the Federal Circuit recently explained that "[a] party alleging either an express or implied-in-fact contract with the government 'must show a mutual intent to contract including an offer, an acceptance, and consideration'" and that "'the Government representative who entered or ratified the agreement had actual authority to bind the United States.'"  <u>Bank of Guam</u>, 578 F.3d at 1326 (quoting <u>Trauma Serv. Group v. United States</u>, 104 F.3d 1321, 1325 (Fed. Cir. 1997) (citing-in-turn <u>City of El Centro v. United States</u>, 922 F.2d 816, 820 (Fed. Cir. 1990) (further citations omitted))).  Additionally, "'The question of whether a contract creates a duty is . . . a question of law.'"  <u>Bank of Guam</u>, 578 F.3d at 1326 (quoting <u>Trauma Serv. Group</u>, 104 F.3d at 1325).  To demonstrate a party's intent to contract, "[T]here needs to be something more than a cloud of evidence that could be consistent with a contract to prove a contract and enforceable contract rights. . . . [T]here must . . . be a clear indication of intent to contract."  <u>D & N Bank v. United States</u>, 331 F.3d 1374, 1377 (Fed. Cir. 2003) (quoted in <u>1st Home Liquidating Trust v. United States</u>, 581 F.3d 1350, 1355 (Fed. Cir. 2009)).  For the reasons stated below, the court finds that the plaintiff has not pled sufficient facts to show that the AO, in the August 2005 letter, intended to contract to fully fund the portion of LASNY's pension plan attributable to the FDD.

Here, while the parties agree that the August 2005 letter formed the basis of a contract insofar that the AO agreed to pay for the listed expenses, LASNY has not alleged

any facts to show that there was also an express meeting of the minds with regard to funding the FDD pension deficit.  The August 2005 letter does not mention the pension deficit, the proposed spin-off, or an agreement to pay the portion of the LASNY pension deficit attributable to the FDD.  LASNY alleges that it knew it had a pension deficit problem before fiscal year 2005 ended, but LASNY does not allege that it shared this knowledge with the AO until after the grant had concluded.  Indeed, LASNY alleges that it began discussions with the AO regarding the pension deficit after the conversion from FDD to FDONY in October 2005.  In such circumstances, the court cannot conclude from the offered facts that the AO expressly agreed to pay the FDD portion of LASNY's pension deficit in the August 2005 letter.

Second, such an agreement cannot be inferred because the pension deficit is not on the list of payments referenced in the August 2005 letter.  That list was comprised of benefits-related expenses and other expenses as follows:

Money to Establish Benefits (All one month's premium unless specified).

| | |
|---|---|
| $60,000 | Oxford Medical |
| $3,600 | Horizon Dental |
| $600 | Spectera Vision |
| $1,900 | Met Life Group Life/ A D & D |
| $1,000 | Guardian Long Term Disability |
| $300 | Fid Ins of America NY State Mandated Short Term Dis |
| $1,700 | Guardian [S]upplemental Short Term Disability |
| $950 | Employee Assistance Program (Yearly) |
| $1,000 | C[OBRA] Admin (Yearly) |
| $2,000 | [New York State] Unemployment Insurance (Estimate) |
| $73,050 | |

In addition, the following are required:

| $10,000 | JP Morgan Chase Bank to open Accounts |
| $10,000 | Citibank NA to open Account |
| $5,000 | TransitCheks Up Front Payment |
| $5,000 | Regular Insurance including Prof Liability.  No quotes yet, but an estimate. |
| $6,250 | Vanguard.  Set up fees for defined contribution pension fund. |
| <u>$10,000</u> | Misc including possible payment to accounting firm to review controls |
| $46,250 | |

Mot. Dismiss 15 (August 2005 letter).  These expenses total $119,300 and not one entry exceeds $60,000.  Given these facts, it is highly implausible that the AO agreed to cover a $1.7 million expense but did not include it in this list.  Under the doctrine of *expressio unius est exclusio alterius*, it is well-settled that "[w]here certain things are specified in detail in a contract, other things of the same general character relating to the same matter are generally held to be excluded by implication."  Grover C. Grismore, Principles of the Law of Contracts § 105, at 164 (1947)); <u>see</u> <u>Nicholson v. United States</u>, 29 Fed. Cl. 180, 196 (1993) (basing its holding that a contract excluded certain items on the doctrine of *expressio unius est exclusio alterius*).  Similarly, given the repeated references to life insurance, health insurance, and fees for a defined contribution pension fund, it is all but impossible to infer from the language of the August 2005 letter that the government agreed to pay for the portion of LASNY's defined-benefit pension plan deficit attributable to the transferred employees without express mention.  <u>Id.</u>[15]

_____

[15] LASNY's reliance on the "any other legitimate expenses attributed to the [FDD]" language contained in the August 2005 letter does not alter this conclusion.  As with LASNY's claim that this language demonstrates that the AO agreed to pay the pension deficit in the Grant

In short, there is nothing in the terms of the August 2005 letter from which it can reasonably be inferred that the AO agreed to pay LASNY for the portion of its pension deficit attributable to the FDD employees. Thus, the court agrees with the government that LASNY has failed to allege sufficient facts to state a claim for supplemental grant funds based on the theory that the August 2005 letter established a separate contract between the AO and LASNY to pay the FDD portion of LASNY's pension deficit. Accordingly, LASNY's claim for payment based on the letter as a separate contract must be dismissed.[16]

---

Agreement, when viewed in context, this language cannot demonstrate that the AO intended to pay $1.7 million in pension costs, costs of which the plaintiff does not allege to have informed the AO until after the letter was written. Again, as discussed above, it beggars belief that the AO, in a letter listing sixteen other benefit-related expenses totaling $119,300, understood that it was also agreeing, in that same document, to pay a $1.7 million dollar expense without explicitly referencing it. Thus, any claim on this basis must also fail.

[16]In its response (although not in its complaint), LASNY states that the government breached the implied covenant of good faith and fair dealing when it refused LASNY's proposed spin-off of a portion of its pension plan. According to LASNY,

> In the instant case, [the AO] interfered with LASNY's proposed spin-off of the pension plan, thereby breaching its duty to cooperate under the covenant of good faith and fair dealing and causing LASNY to incur an additional $1.7 million in pension liability without reimbursement under the Grant. Although LASNY proposed to equitably share the pension liability after dissolution and conversion of FDD to a CDO, [the AO] refused to cooperate and directed LASNY to assume the entire pension liability paid out to the former FDD employees now working at the new CDO.

Pl.'s Resp. 14. At oral argument, it became clear that the plaintiff was alleging that the government had agreed to pay the cost of the deficit, and that by denying the pension spin-off and foreclosing all other avenues for LASNY to recoup this deficit from the government (i.e., refusing to give LASNY supplemental grant funds to pay the deficit), the government breached its duty to pay for the pension costs. See, e.g., Tr. 44:13-18 ("[T]he AO knew that by rejecting the spin[-]off, the entire burden of the pension deficit was going to remain with [LASNY]. So

II.     **This Court Does Not Have Jurisdiction to Restrain the Government from Collecting the Unspent Grant Funds.**

Finally, as stated above, LASNY seeks to retain the $351,567 in unspent grant funds that it retained after the grant ended as partial payment for its pension deficit claim. The government moves to dismiss the plaintiff's claim to retain the unspent grant funds on the grounds that without a contract claim, this court does not have jurisdiction over this claim.

The government asserts that this court cannot retain jurisdiction over LASNY's claim for retention of the unexpended grant funds because LASNY has not stated a contract claim. The court agrees that this claim must be dismissed for lack of jurisdiction.

It is well-settled that the Court of Federal Claims may only hear a claim brought against the United States if Congress has specifically and unambiguously waived the government's sovereign immunity for such a suit.  United States v. Testan, 424 U.S. 392, 397-98 (1976).  The jurisdiction of the Court of Federal Claims is set forth in the Tucker Act, 28 U.S.C. § 1491 (2008).  Under the Tucker Act, this Court may hear only claims

_____

they knew that the result of their actions going to be that kind of financial burden, and they intentionally rejected the spin[-]off plan.")  In rejecting the plaintiff's plan to transfer these pension liabilities (and benefits), according to LASNY, the government breached the implied covenant of good faith and fair dealing by resting the burden of paying the deficit on LASNY's shoulders.

Having determined above that the government never agreed to pay for the deficit and that the pension deficit arose before the dissolution of FDD and was not created by the conversion, the court finds no merit in the plaintiff's contention that the government breached the covenant of good faith and fair dealing.  Accordingly, this basis for LASNY's $1.7 million claim also must fail.

seeking primarily monetary relief against the United States based upon the money-mandating provisions of "the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).  In construing the Tucker Act, courts have held that this waiver of sovereign immunity permits the court of Federal Claims to render money judgments against the United States, but does not give the court the ability to award general equitable relief.  See, e.g., Bowen v. Massachusetts, 487 U.S. 879, 905 (1988) (holding that the Court of Federal Claims does not have general jurisdiction to grant injunctive relief); United States v. King, 395 U.S. 1, 5 (1969) (holding that a suit for declaratory judgment falls outside the jurisdictional purview of the Tucker Act); Brown v. United States, 105 F.3d 621, 624 (Fed. Cir. 1997) (holding that claims for declaratory and injunctive relief were outside the jurisdiction of the Court of Federal Claims); Stephanatos v. United States, 81 Fed. Cl. 440, 445 (2008) (holding that "the Court of Federal Claims has no authority to grant equitable relief 'unless it is tied and subordinate to a money judgment'" (quoting James v. Caldera, 159 F.3d 573, 580 (Fed. Cir. 1998) (further quotation removed))).[17]

---

[17]Congress has amended the Tucker Act to create exceptions to this general rule.  For example, the Alternative Dispute Resolution Act of 1996 confers "jurisdiction [upon the Court of Federal Claims] to render judgment on an action by an interested party objecting to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement" and the ability to "award any relief that the court considers proper, including declaratory and injunctive relief . . . ." 28 U.S.C. § 1491(b).  However, the plaintiff concedes that its claims do not arise under this subsection.

Under section 1491(a)(2) of the Tucker Act, the Court of Federal Claims is authorized "to provide an entire remedy and to complete the relief afforded by [a] judgment." 28 U.S.C. § 1491(a)(2).  Section 1491(a)(2) empowers the Court of Federal Claims to:

> issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States.  In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just.  The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act.

28 U.S.C. § 1491(a)(2).  It is well-settled, however, that the incidental equitable powers set forth in section 1491(a)(2) of the Tucker Act must be "tied and subordinate to a money judgment."  James, 159 F.3d at 580.  The court may use this authority "to aid in rendering [a] money judgment," such as in cases where an audit or some other procedure is necessary to arrive at a money judgment.  Pauley Petroleum, Inc. v. United States, 591 F.2d 1308, 1315 (Ct. Cl. 1979) (citation removed) (distinguishing between a permissible declaration of rights ancillary to a money judgement and an impermissible declaratory judgment sounding in equity); see also cases cited therein.

Because the plaintiff has not stated a claim for $1.7 million, the full amount of the pension deficit, the court has no basis on which to exercise jurisdiction over this claim for

purely equitable relief.  Thus, this court cannot consider the plaintiff's claim of entitlement to retain these funds.

## CONCLUSION

For all the foregoing reasons, the court **GRANTS** the defendant's motion to dismiss the plaintiff's complaint for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) and for failure to state a claim pursuant to RCFC 12(b)(6).  The Clerk is directed to enter judgment for the defendant.  Each party is to bear its own costs.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge